## TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Radcliffe B. Lewis

*Plaintiff, Pro se*

v.                                                          1:08-cv-1314-RJL

District of Columbia, Et al

*Defendants*

---

## ~~PREEMPTIVE PROCEDURAL MOTIONS~~

### FOR RECONSIDERATION

**and**

### MOTION FOR ENLARGEMENT OF TIME TO COMPLY WITH THE COURT'S ORDER

*Pursuant to Fed. R. Civ. P. 6(b). and Fed R. Civ. P. 15 respectively, as well as Fed R. Civ P. 60(b) and LCvR 7(i).*

#### Introduction

**I.** Plaintiff Radcliffe B. Lewis now moves this Court reconsider its order of dismissal and to enlarge the time necessary to comply with the Court's Order of 15 August 2009 (hereto hence the "Order") directing plaintiff to provide the Court with "the complete name, address and/ or exact badge number of Officer Anderson so that the Marshals Service may effect proper service of process upon this remaining defendant utilizing the procedures established pursuant to the Metropolitan Police Department ("MPD") Amendment Acton of 2006..." (hereto hence the "Act") as well as to grant leave of time for the filing of this motion for enlargement of time, it being it is prepared on 17 September 2009.

**II.** Plaintiff also seeks reconsideration of Defendant Greyhound because there is no indication in the record that Greyhound was ever served the initial complaint and summons in this case.

## Consent

**III.** On 17 September 2009 between 1530 and 1535 hours, plaintiff telephoned the Office of the Attorney via telephone to numbers (202), 442-9840 and (202) 442- 9845 to obtain consent from the counsels for the District of Columbia, but counsels Adams, and Valdes and other counsels were not available. Plaintiff also telephoned the Law Officess of Ogletree, Deakins, Nash, Smoak, and Stewart, P.C. at 202) 887-0866 to likewise obtain conent for the filing of thes motions but counsels were not available.

## Report on Activities of Plaintiff - Limitations

**IV.** In keeping with the Order, plaintiff reviewed the Act to determine what if any additional privileges were available to Plaintiff in his search for the culprit cyborg known thus far only as "Anderson". The Act did not indicate any particular powers such as subpoena power or authority to conduct discovery or interrogatories upon the thus far dismissed defendants, District of Columbia, or Greyhound. The Opinion accompanying the Order also indicates that this Court "declines to exercise supplemental jurisdiction over any remaining c.... against the District of Columbia. The Order indicates that failure to comply with the Order "will result in dismissal...without prejudice and closure of the case."[1]

## Crime Scene

V. Plaintiff therefore engaged this process despite there being no indication that he would be able to gain cooperation from the dismissed defendants. Plaintiff visited the Greyhound Bus Station where the inciting incidents occurred. Notably he visited

  • on 31 August 2009 at 2309 hours to 2317 hours (Visit A),

---

1. It appears that the Opinion was published without the need for a PACER account to access it, but that the Order was not likewise published; but because Plaintiff is not an attorney of the bar, any subpoena sought requires motion to the court prior. The Court did indicate that in its own estimation it would be "unlikely" for Lewis to locate Anderson, but did not indicate why. Plaintiff exercized due caution as a result and was very deliberative with his steps.

- on 2 September 2009 at 1945 hours to about 2045 hours (Visit B),
- on 5 September 2009 at 1129 hours to 1200 hours, (Visit C).

*On Anderson*

VI. Plaintiff visited at other times as well but these particular visits proved to bear no fruit regarding the possible whereabouts of Anderson.

*Regarding Cameras*

VII. On his first notable visit Plaintiff took notes on the camera system installed by Greyhound, and learned from an informant that Anderson still comes around, however Plaintiff could not verify this report.

*Other Officers*

VIII. On his second notable visit upon checking at the security desk installed by Greyhound to house their security staff when they work on the premises, Plaintiff learned from one Charleston Brooks, MPDO Badge # 5225  that as for the police officers that patrol the area, "we are independent contractors".

Plaintiff later observed Brooks upon having taken a package of food from a female within the premises, walking outside and placing the package on the sidewalk beside a garbage can.  The package contained two closed cans of beer.

IX. On his third trip Plainiff spoke to one C. Turner, MPDO #5200 who gave no recollection of Anderson, and upon plaintiff requesting his consent to the documenting of his identity (name and badge number), Turner stated, "Anything civil I don't know nothing about it."

An unidentified employee then came forward and indicted that "Anderson hasn't been here for over a year now.

**Finding - On Anderson the Deceased (Alleged)**

X. Finally, plaintiff learned from others who frequent the area that Anderson is already deceased.

## On Anderson the Taller and Shorter

XI. Based upon the information gathered Plaintiff visited the police district at 500 E Street, South West and learned there are two Andersons, who are referred to as Anderson the Taller and Anderson the Shorter and that Anderson the Shorter could be found at 500 E.Street, South East.

Additional Information Regarding Activities, Discoveries, and Reporting Thereof

## Interruptions

XI. The information above was drafted into this pleading prior to this Court's order on 1 October 2009 dismissing this case; an order that was anticipated, as plaintiff could not timely report the full scope o f the activities and discoveries at a detailed level by 16 September 2009. What was not expected was the simultaneous Order of 1 October 2009 in the related case of *Lewis v District of Columbia Judiciary, Et al, Case No. 07-697* ordering remaining parties therein to file a joint statement within about 20 days thereafter. Plaintiff therefore concentrated on that matter first, but then met stiff Resistance from the Government of the District of Columbia relative to the development of the Joint Statement there, and further circumvention tactics employed by the District of Columbia Council whose own staff attorney asserts that the Council is not the District, a line of argument that mirrors defendant Metropolitan Police Department in this case asserting that the "Metropolitan Police Officers"are not the "Metropolitan Police Department", which raises that question of just exactly who do those taxpayer "government agents" serve. Note 18 U.S.C. §1346. Note United States v. Sun-Diamond Growers of California, No. 98-131, Decided 27 Apr. 1999.

## Anderson The Shorter Visually Located

XII.  That said, Plaintiff now discloses that on or about 14 September 2009 after several visits to the two police stations, Plaintiff was able to see Anderson the Shorter, one "K. Anderson" Badge number 4108, who matched in complexion the identity of the "Anderson" who Plaintiff alleges was his assailant, albeit with more hair, and a much more pleasant demeanor, and who denied that he ever worked as a security agent at the Greyhound bus station (the location of the arising incident).  Plaintiff has yet to meet Anderson the taller.

### Conflict Related to "Anderson" as the Assailing Cyborg

XIII.  Additionally there was another officer at the South East police station where plaintiff met Anderson the Shorter, who has a like complexion but a more vexing demeanor befitting the "Anderson" assailant/cyborg.  To Plaintiff's now recollection that officer's last name was Lee.

### Discussion

*Findings - the (Replicant) "Andersons"*

XIV. The summary findings by plaintiff in relation to the identity of "Anderson" indicates that the District may have had at least three such cyborgs patrolling the the First District precinct area in its jurisdiction over the past several years, to wit:

> A. Anderson the Deceased,
>
> B. Anderson the Taller, and
>
> C. Anderson the Shorter.

XV. A visual inspection of Anderson the Shorter reveals two entities of interest relative to Plaintiff's recollection of the possible assailant, both of like complexion,  one (Anderson the Shorter) begin abouut six feet tall[2], and a "Lee" who is about five feet seven inches tall (or

---

2. Yes, Anderson the Taller is reputed to be even tall than six feet.

at least shorter than Plaintiff, but wheres an expression befitting the cyborg assailant. Thus though Anderson the Shorter appears to be the suspect cyborg, and may not at this juncture be ruled ourt, because of the latency of time and the dependence on solely the memory of plaintiff, niether can Lee nor the other Andersons. And though the consideration of Lee may appear to be a stretch, it is not given the fact that the suspect cyborg sought to cover up his identity; for there is no transparency of who were employed by Greyhound, or who were contracted for that matter "free agents") and who were not, and to what degree any degree of deviance were contrived to effect the ousting operation, which invariably could have included the misuse of identification decals such as name tags, a possibility that can in no wise be ruled out at this juncture.   Plaintiff was careful with his steps prompted by the apprehensive expectation disclosed by the Court itself, which, given the extensive canvassing these many years after the fact produced little result because there is nothing in the Act governing the rules of the canvassing operation, to wit: the Metropolitan Police Department Amendment Act of 2006, that empowers the canvassing agent and or party to exercise any marshaling power in order to acquire transparency of information from the defendants in order to narrow the list of persons of interest so as to decipher  the actual "free agent" that  was  involved, or to decipher if something more sinister than that was afoot.  However, there is a better way.

### On the Need for Transparency and how That May Be Effected

XVI. Both defendants, Greyhound and the District have evidence that can be applied to the discovery process in this regard.  Greyhound for its part has the cameras from companies such as Ultrak and Pelico, and the information from those cameras are not likely to be holographic video and disposed footage but digitized images stored in transistors and quite recallable. Note Exhibit 1 hereto.  Greyhound is also able to provide the list of "free agents" that it has depended on over the the years to provide security at the bust station that is the crime scene..  This information can be correlated with the list from the Chief of Police maintained in accordance with DCMR 6-A302.  A cross referencing of this information is all that is needed in order to eliminate the extraneous entities of interest an decipher the identity of the assailing cyborg, whether it be a lawful free agent, an employed Metropolitan Police Officer, and, or, an

impostor otherwise.  Acquisition of the related 911 calls and police radio runs and triangulate
the identification process and affirm the identity of the cyborg that was so able to acquire the
cooperation of other taxpayer funded "Metropolitan Police Officers" that are not members of
the "Metropolitan Police Department".

Justification for  Furtherance of Discovery

XVII.  For brevity, had the Disrtrict engaged under the filed tort claim provisions, adequate
administrative action to resolve this matter in a timely fashion the plaintiff would not have had
to suffer the entropy of memory to now be befuddled by the numerous "Andersons" and other
frownish men uniformed in as police officers in the District so as to require a more extensive
visual review in order to verify the assailing cyborg.  Had the officers being identified as "free
agents" and not agents of the municipality, the plaintiff would not have had to bear the burden
of exhaustively seeking administrative remedy in order to get to court.  Had the District been
more cooperative the plaintiff could have long been furnished with appropriate material in
order to then turn back to the co-defendant, Greyhound to triangulate, if necessary then, the
identity of the assailing entity.  But what the plaintiff has learned from this endeavor is the

*Note*
*Exhibit 2*

effectiveness of the elongation of phenomenal time and the tactic of not disclosing identities
that the District has been able to put to use here in order to so well thus far obstruct the
path of justice, and alas these two tactics have been well learned by its employees/agents/
officers/other cyborgs/sub-entities/independent entities and such the like other co-conspirators
and beneficiaries such as Greyhound in engaging various tactics to systematically undermine
the economic viability of this plaintiff, Radcliffe B. Lewis, who happens to be regarded as
threat relative to his interests at law and how they conflict with the macro-economic interests
of the district exemplified in thee related case of Lewis v District of Columbia et al, 07-697,
and as indicated in Exhibit 3 hereto.

In keeping with the foregoing, Plaintiff hereby requests reconsideration of the dismissal of this
case.

Respectfully submitted by 

_____

Radcliffe B. Lewis, Plaintiff

1246 New Jersey Avenue, NW

Washington, DC  20001

### Certificate of Service

I hereby affirm that on this 2nd day of November 2009, I caused a copy of the foregoing

**FOR RECONSIDERATION**

**and**

**MOTION FOR ENLARGEMENT OF TIME TO COMPLY WITH THE COURT'S**

**ORDER**

notice to be served upon the following:

Peter Nickles, George Valentine, Patricia Jones, Corliss Vaughn Adams, Leticia L. Valdes, and Tasha Hardy

Office of the Attorney General for the District of Columbia

441 4th Street, NW, Washington, DC  20001

*Attorneys for the Defendant District of Columbia and the Metropolitan Police Department;*

Marilyn McCauley, Rafael Eloy Morell

Ogletree, Deakins, Nash, Smoak, and Stewart, PC

2400 N Street, NW, 5th Floor, Washington, DC  20037

*Attorneys for Greyhound Bus Company;*

and

Stephanie D. Scott, Secretary of the District of Columbia

1350 Pennsylvania Avenue, NW, Room 419, Washington, DC  2004

*Designated Recipients for "Anderson" and "Emmanuel Oghogho, Staff Member, Office of Risk Management".*

Sign:

11/?/09    R. Lam

We are currently working on updating our website for a more optimized customer experience. Please excuse our "dust" during the construction process.





Home | Search | About Us | Contact | Site Map

**Can't Find It? Call 800 284-2288 or Email Us Today**

View Cart 🛒 Checkout

CCTV
Cameras
Monitors/Displays
Lenses
Mounts/Accessories
Recorders
**VISION INDUSTRIAL**
Cameras
Monitors/Displays
Optics/Lenses
Frame Grabbers
**PRO VIDEO**
Camcorders
Monitors
**OTHER**
GSA
Microphones
Manufacturers
Clearance



*If you cant find what you are looking for on our web pages please call or email us.*

With the volume of products available to us it is impossible to keep all the pages current and updated. We have a toll free number good for all of the USA which is 800 284-2288 (for the Los Angeles office use 888 284-2288) and plenty of people here to help you find what you need. Our central email address is sales@avsupply.com. We stock and sell a complete line of industrial and medical video equipment and are friendly and responsive to all requests. If you have special budget constraints ask us if we can help. Our relationships with manufacturers are usually based on high volume sales and in many cases we can combine orders to get substantial cost savings for you. Thanks for trying Audio Video Supply.





## Ultrak KC7500CN 1/3 inch CCD High Resolution DSP Color Camera



Click Here for Price and Availability

### Description of Ultrak KC-7500CN

**This Ultrak KC-7500CN high resolution DSP color camera produces outstanding color images for the most resolution-intensive color applications. With 470 lines of resolution, a sensitivity of 0.9 lux and an advanced feature set such as multi-format BLC, AGC auto/manual white balance, auto/manual shutter speeds and Gamma control, this 1/3 inch CCD DSP camera allows the CCTV professional to ensure the highest quality image and performance for his application. Physical characteristics such as the C/CS/back-focus ring and push-button terminal strip for power make the installation easier.**

## Features of Ultrak KC 7500CN

- **1/3 inch CCD**
- **High Resolution**
- **Digital Signal Processing (DSP)**
- **470 Lines of Resolution**
- **Sensitivity of 0.9 lux**
- **Multi-format BLC**
- **AGC**
- **Auto/Manual white balance**
- **Gamma control**
- **Manual Shutter**

*Greyhound Uses Ultrak Cameras, Models vary.*

## Specifications of Ultrak KC-7500CN

**Macro Video Zoom Lens Specifications**

# Center
# Researc

## National Center
## Transit Resear

**Cops, Cameras, and Enclosures:**

**A Synthesis Of the Effectiveness**

**Of Methods To Provide Enhanced**

**Security For Bus Operators**

# nter for
# search

**National Center for
Transit Research**

# Na
# T

**National Center
for Transit Research**

Center for Urban Transportation Research
University of South Florida

 CUTR

TECHNICAL REPORT STANDARD TITLE PAGE

| 1 Report No 392-12 | 2 Government Accession No | 3 Recipient's Catalog No |
|---|---|---|
| 4 Title and Subtitle Cops, Cameras, and Enclosures: A Synthesis Of the Effectiveness Of Methods To Provide Enhanced Security For Bus Operators | | 5 Report Date 31 May 2001 |
| | | 6 Performing Organization Code |
| 7 Author(s) Darin Allan & Joel Volinski | | 8 Performing Organization Report No |
| 9 Performing Organization Name and Address National Center for Transit Research Center for Urban Transportation Research College of Engineering / CUT 100 University of South Florida 4202 E Fowler Ave Tampa, FL 33620-5375 | | 10 Work Unit No |
| | | 11 Contract or Grant No DTRS98-G-0032 |
| 12 Sponsoring Agency Name and Address Research & Special Programs Administration US Department of Transportation RSPA/DIR-1, Room 8417 400 7th St SW Washington, DC 20590 | Florida Department of Transportation 605 Suwannee St Tallahassee, FL 32399-0450 | 13 Type of Report and Period Covered |
| | | 14 Sponsoring Agency Code |

15 Supplementary Notes
Supported by a grant from the Florida Department of Transportation and the U.S. Department of Transportation.

16 Abstract
The safety of operators and passengers is a primary concern of transit systems and has become an increasingly important issue to transit bus operators themselves. Many transit agencies have experienced incidents of assaults against their bus operators that have resulted in serious injuries or deaths. These incidents can also expose passengers to assault and injury. Even when there are less serious consequences, assaults on operators can lower their morale, increase absenteeism, and strain labor-management relations over whether or not the agencies are doing enough to protect their employees.

There is also substantial cost to transit agencies in terms of lost availability of operators who rightfully go on workers' compensation status. A number of transit agencies use different techniques to minimize the possibilities of assaults against their bus operators and passengers. Many use either uniformed or plainclothes police officers or security guards on particularly troubling routes. Digital cameras strategically placed inside buses are also being used to help discourage criminal assaults as well as other unwanted behavior such as graffiti and unwarranted claims of injuries from passengers (or alleged passengers). Perhaps the most visible effort to discourage assaults on operators is the provision of bus operator enclosures that separate the operators from anyone else on the bus and protect them from attacks. However, while this method can provide enhanced protection to bus operators, it might negatively affect passenger relations and increase the image of a bus as a place where crime might be committed.

This project surveyed transit agencies that have employed these techniques to determine their level of success, cost effectiveness, and acceptance by both bus operators and passengers. The project also identifies other techniques transit systems are using to increase the chances of their bus operators avoiding dangerous situations, such as passenger relations training to avoid conflict. The effect "full wrap advertising" has on onboard activity and safety of passengers is also explored. This project is presented in synthesis form.

| 17 Key Words Transit, security, bus operator, assault, crime, police, video, surveillance, enclosure, CAD/AVL, training, law. | 18 Distribution Statement This document is available to the public through the National Technical Information Service (NTIS), http://www.ntis.gov/. An electronic version in the .pdf file format is also available to the public via the NCTR web site at http://www.nctr.usf.edu/. | | |
| 19 Security Classif (of this report) Unclassified | 20 Security Classif (of this page) Unclassified | 21 No of pages 83 | 22 Price |

Form DOT F 1700.7 (8-69)

## Examples of Incidents

None of the surveyed transit systems provided examples of potential threats or actual crimes captured by onboard video surveillance. User testimonials from one supplier, however, did include a 1998 letter from the Deputy Attorney General of Delaware who praised the use of video evidence to successfully prosecute a child sex offender. A paroled offender molested a young male onboard a bus operated by the Delaware Transit Corporation. The video surveillance system captured images recorded during the incident that were subsequently used by the Department of Justice to convict the man for this offense.

Other customer testimonials included a letter from an official with the Milwaukee County Transit System who related successful use of video images to identify high school students known to have assaulted bus operators and passengers and to assist police in their investigations of theft and vandalism incidents. SunLine Transit Agency (Thousand Palms, CA) reports successful use of video surveillance in resolving disputes between operators and customers and in reducing vandalism by supplying local police face shots of "taggers," i.e. gang members making their distinct marks on public property, including bus interiors.[13]



Picture 10  Additional cameras can provide greater coverage of onboard, and some exterior, activities.  (Image courtesy Kalatel.)

This is Google's cache of http://www.unitedstatesaction.com/train-bus-security.htm. It is a snapshot of the page as it appeared on Sep 24, 2009 23:01:17 GMT. The current page could have changed in the meantime. Learn more

These search terms are highlighted: greyhound bus security cameras                    Text-only version

 # United States Action 

*UnitedStatesAction*
*Yahoo Group*

*Back to US Action*
*Home Page*

# USA SECURITY:  TRAIN AND BUS TRAVEL SECURITY



- ## TRAIN TRAVEL SECURITY UPDATE

- ## BUS TRAVEL SECURITY UPDATE

 

## November 19, 2001 - Airport Security Bill Signing

The president also mentioned Monday that train and **bus** travel would be targeted for **security** upgrades, but he did not offer any details.

## October 5, 2001 - Amtrak Announces Additional Identification and Ticket Purchase Requirements

National Railroad Passenger Corporation
30th and Market Streets
Philadelphia, PA  19104
**www.amtrak.com**

FOR IMMEDIATE RELEASE
Contact: Cecilia Cummings, 215-349-2735
Karen Dunn, 215-349-3457
October 5, 2001

**AMTRAK ANNOUNCES ADDITIONAL IDENTIFICATION AND TICKET PURCHASE REQUIREMENTS**

Philadelphia - Amtrak announced today additional identification and ticket purchase requirements for its national system of intercity train service. Effective Monday, October 8th,  guests boarding at any station between Washington, D.C. and Boston will be required to have a ticket prior to boarding the train.

This policy effectively ends the practice of conductors selling tickets on board trains between Washington, D.C. and Boston.  Additionally, photo identification will be now be necessary to purchase tickets from conductors on board trains, as it is in stations, in other areas of the country outside the Northeast Corridor.

Immediately following the September 11th terrorist attacks against the United States, Amtrak enhanced its **security** measures on trains and at stations and other facilities. Among these measures, all guests, 18 years or older, are now required to produce valid photo identification when purchasing tickets or checking baggage in stations and, where allowed, on board trains.

Valid photo identification includes the following:

- State-issued photo driver's license
- State-issued photo ID for non-drivers, or if ID does not carry a photo, it must identify the presenter by physical characteristics
- Passport
- Federal, state or county government issued employee photo ID
- University, college or high school photo ID.

Amtrak has proposed $3.2 billion in accelerated federal funding for increased **security**, safety and capacity measures. A portion of the funds would support nationwide **security** and safety upgrades, including bomb detection technology, surveillance enhancements and the addition of 150 police officers to Amtrak's national accredited police force. The balance of the funding would be used to meet the increased demand for capacity system-wide.

For more information on travel and new **security** measures, guests may contact Amtrak at amtrak.com or (800) USA-RAIL.

## October 31, 2001 - Greyhound Announces Additional Security Processes

## Greyhound Lines, Inc.



Information about **Greyhound** Lines
**October 31, 2001**

Dear Valued **Greyhound** Customer:

Our company's mission is to provide transportation across North America with safety, dignity and convenience. Safety is - and always has been - foremost in our mission.

Making **bus** travel even safer is a responsibility we take seriously. We have made some changes in our **security** programs that began after the terrorist attacks in September. Here are some highlights of our safety enhancements:

- Additional **security** guards and **cameras**
- Use of electronic sensing wands at more than 30 locations
- Expanded pre- and post-trip checks of vehicles
- Temporary restriction of seating in the first row of seats and an increased buffer zone separating the driver from the passengers to reinforce our policy against disturbing drivers while the **bus** is in motion
- Cell phones pre-programmed with emergency numbers in the process of being distributed to all drivers
- Using our ticketing system to ensure passengers properly check baggage and remain with their bags until they are loaded on the **bus**
- Inspecting packages and requiring valid identification from unknown shippers who use our GPX package delivery service
- Cooperating fully with all branches of law enforcement
- Temporary closure of some lockers and parcel checks
- Requiring positive identification from all passengers in certain locations.

We are continually examining ways to make our customers and employees more secure. We are working with the Department of Transportation and Congress to pursue additional **security** measures, including better screening of bags and passengers, securing the driver compartment, and an improved on-board emergency communication system.

Freedom to travel in search of a better job, education, medical care or way of life has always been fundamental to our nation. Enabling that freedom for Americans is my goal as CEO of **Greyhound**.

Thank you for your patience with any inconvenience you may encounter as we continue to roll out new **security** programs that provide you and our employees with a safe experience.

Sincerely,

Craig Lentzsch
Chief Executive Officer



# INTELLEXAE REPORTS

## HOW DO YOU BRAID INDIAN HAIR?

**A QUESTION REGARDING THE DISTRICT OF COLUMBIA'S *JAFAIKAN* FIRST LADY**
(An Open Letter to the D.C. Council)
30 October 2009

Subscribe to Intellexae                           View print edition

**To the Council of the District of Columbia**
*Joint Public Oversight Roundtable*

Kwame R. Brown,  Marion Barry, Mary M. Cheh, and Harry Thomas Jr. ***Chairperserons***
*John A. Wilson Building, Room 500, 1350 Pennsylvania Ave, Washington, DC 20004*

*Regarding:* **The Contracting Process Related to Parks and Recreation Projects**

*Dear Elected Officials:*     <u>The story is simple enough:</u>

*O*ne day in what is supposed to be a quaint city, an old lady purchased a lottery ticket.  Then she misplaced the ticket in the worst way - she inadvertently tossed it in a dumpster.  Then the ticket became a winning ticket, and its value increased to $48 million dollars, so the lady tried to find the ticket and eventually after retracing her steps called the authorities, a commission to report and claim the lost  item, the

### ticket.

Guided by her instructions as to the possible location of the ticket - in a dumpster that is, the commission found the ticket but then they decided to keep it, and the money.  So instead of giving the old woman her lost ticket so she could effect a proper claim according to previously established procedures, they concocted a scheme to create a **bailment arrangement** with a group of lawyers and **embezzle** the ticket, using it to buttress the bond rating of the city, creating a whole bunch of real estate development projects, and inviting a whole bunch of out-of-towners to purchase condominiums in the city, and everybody **lived happily ever after** off the proceeds of the **stolen money,** except of-course that old woman, which the thieves only wish she would just go away and die somewhere.

Now the thieves knew the woman would try to lay her claim, **try to fight, and she did**; she hired a lawyer from the very beginning, but alas, it seems he was in on the game too and tried to get her to settle for not a penny above <u>precisely</u> one million dollars.  And when the woman said no to that, suddenly some short time thereafter she succumbed to the pressure or something else and fell gravely ill, now lock away in a nursing home like an adulterous Muslim woman stuck in a convent, where she is expected to just stay till she dies and goes away.

The thieves where clever too, they generated a **new set of regulations** to cover their tracks and caused one of their attorneys to **sit like a judge** with the title "attorney examiner" where he then drafted something called a <u>Findings Of Fact And Conclusion Of Law</u>, or what I call a FOFACOL [foe-fa-col] for short, (and if you say that very fast you may see why I call it that), using certain regulations **designed to hide** the entirety of the ensuing legal proceedings from the public.

Now what the thieves never counted on was that the woman would have **a son who would fight** for this lost legacy, *so that rather complicates things*; but when he entered into the litigation fray, they were even able somehow to get the presiding trial judge to sit on the case for about a year, keeping the **records in her chambers,** and to get one of the other lawyers with a background from one of the city's auditing law firms to sit as an appellate judge to stuff it, the case that is, and other judges to keep other proceedings (*in camera*) which means **secret**, so that the public never find out the claim to the lottery money is disputed.

See, the key to their influence is this: that claim that the old woman hired a lawyer to file - was never filed. The lawyer may have file a lawsuit, but he never filed **the claim**, and since the claim was never filed, that's one way in which that FOFACOL is able to hold sway over the proceedings.

> **But you see there are three problems the thieves have and those are:**
> 1. Their own regulations requires disclosure of the winner to the public,
> 2. A family has a **legitimate right** to claim lottery winnings, and
> 2. No agent of the commission is able to claim the winnings.

So the finer point of the status of this phenomena is this: it isn't that they *stole* the money, it is that they are *stealing* the money. They need to outlast the son for a period of ten years so the statute of limitation can set in, and we are in year ten, (9 years, 10 months, 18 days to be exact) if we count from the first day of ticket and not the first day of notable embezzlement activity, which comes later. But you can't file the claim if you don't have the ticket in possession, and you can't possess the ticket if you don't win the case, and you can't win the case if you don't file the claim - got it?

Now the question becomes who would want to live is such a corrupt town and where are the ethical leaders? Where is this city anyway, and who is the old woman whose day of justice has been so trampled by a labyrinth of miss-process?
And you guessed it correctly by now if you wonder if its here, because that city is this city, Washington, District of Columbia, and that old woman is my mother, Barbara Jean (Rowtham) Lewis, and the commission is none other than the District of Columbia Lottery and Charitable Games Commission, and the ticket in question is the December 11, 1999 Powerball ticket that won that game.

You the members of the Council are now apprised that something has been brooding under the skirts of the

Lottery Technology Enterprises - Global Technology Enterprises - Sell the **DC Lottery (To India)** - **Natwar Gandhi** - City ***bond rating*** - Tax Office **Scandal** - **Magic number**

**"48"** - Second **Powerball** winning in 10 years  - **OCTO Indians - Fenty** parceling out
money
**bru-ha-ha -**

- for some time now but can't seem to get your minds' tentacles around the connective tissue
under-current because who wants to hear that there may even be a remote possibility that the
capital city of the United States of America is in the racketeering and embezzlement business
of stealing lottery winnings money from old people and their black sons to buttress the budget
in the name of development?

Your own staff members and those of your General Counsel, Brian Flowers tried to avoid
notice of the issue, so to add fuel to the corruption fire, even here the rules are changing,
with the attempt to avoid notice of any legal proceedings that the old woman's son may have
undertaken that may be even remotely related to that $48 million snow job with the insistence
that the only way this council will pay attention to even a federal judge's order to cooperate on
one of those cases is if you the council and the members of the council are served summonses
by the United States Marshals, otherwise "The D.C. Council is not the Government of the
District of Columbia" and this excuse doesn't look good in the lime light of expected ethical
conduct is it, even if it is legally deemed correct?

So now you see that this round-table discussion that you have convened can be of some
purpose after-all respective to your implied mission regarding "public oversight" assuming that
is - that "public oversight" relates to maintaining the confidence of the public relative to trust
and fidelity of government as opposed to maintaining the control of public perception blind
to collusion and dishonest services under the cloak of government.  At the very least you can
see that there is some semblance of **probable cause** for a better investigative framework than
what your city's current attorney general has laid out, for there is no investigating on his part
of contracts under $1 million, or the acts and actions of the DCRA, or the Chief Financial
Officer, Natwar Gandhi, for that matter.  Your city's attorney general is by no means interested
in prosecuting white collar crime, and there seems to be no investigation to uncover the high
crimes and misdemeanors that appear to be underway at the hands of some of the high officers
of your Westminster styled government structure with its British Citizen Indian *Jafaikan*
Comparative Law-Finance Technology Transactions Operating First Lady.

Fortunately for us, **neither the government, nor the OAG hold a monopoly on prosecuting
white-collar crime,** and given the circumstances, it would appear better for your interests
and (for now) the interest of this otherwise supposed to be quaint city if you, and not I,
investigate the probable cause for your current *reson-detra* and prosecute the charges if in fact
the probable causes relative to the affairs I now put before you bear credible fruit.

At this juncture, the only thing I can assure you is this, that one of us, you, or I, will be able to
prosecute something.  At the very least, **it is a crime to** impersonate one's heritage and **suggest
to the public that you are of a heritage that you are not,** but if you don't believe me on that
light, then ask, how do you braid Indian hair?
*The Public, Ladies and Gentlemen, has a right to know.*

Sent to you  by:

/s/ Radcliffe B. Lewis

Radcliffe Bancroft Lewis, *Claimant, Complainant, Plaintiff, Son of a real Jamaican, Real Jamaican by Nativity and Upbringing, Son of Ronald Benjamin Lewis and Barbara Jean Rowtham of Newman of Jamaica of Newman of Glasgow of Scotland, by Fidelity of Blood through the Sanctity of Marriage and of Gentle Birth, Citizen of the United States for Your Purposes, Veteran of the United States Naval Forces, Resident of Maryland but Considerd Resident of Washington County-now-District of Columbia for Your Purposes, and Member of the Public Otherwise.*

1246 New Jersey Avenue, NW
Washington, DC 20001

Email: radcliffego@hotmail.com

**CJA Investigator Dispute:** Lewis v DC et al, US District Court DC, Case No. 07-cv-697
**December 11 1999 Powerball Dispute:** Lewis v DC et al, DC Court of Appeals No. 02-AA-171
**Metropolitan Police Department Dispute:** Lewis v DC et, US District Court DC Case No. 08-cv-1314

---

**Follow these and related issues by subscribing to
www.intellexae.blogspot.com**